23-1379, Southern Iowa, Conitech USA, v. McLaughlin Freight Services, et al. Mr. Collins? Yes, Judge. Good morning. Proceed when you're ready. Good morning, and may it please the Court. I'm here today representing McLaughlin Freight Services asking you to dismiss the claims of fraud and unjust enrichment that were made against it, that the jury returned a verdict on, and that the district court denied our pretrial motions. Counsel, could you raise your podium? There's a button there to your right that can raise that podium a little bit and get the mic a little closer. Thank you. What we're dealing with is an issue that the plaintiff in this case, Rubber Company in Mount Pleasant, their witnesses acknowledged that the procedure that they operated under to receive rubber that my client brokered to find trucks to ship into Mount Pleasant, by default, if no one else was available to pay the rates that they ended up paying, they would have used us and paid us the rounder rate. That's the phrase in the briefings. At trial, they didn't present any evidence that someone else had trucks available, that someone else would have been paid any different, that there was another company that would have hauled the freight for less. Why is that relevant? Why is that something that had to be taken into account on a fraud claim, that these receipts or submissions are made for payment for services that were different? You asked for rounder's fees for what weren't rounder's services, and the rounder's fee was paid. That's the claim. I'm not sure where you're saying and where the law requires this additional evidence you're saying is missing. Well, Judge, there is an evidence about the services. The misrepresentation was about approval to do the work, not misrepresenting the work itself. So if you look at Mr. Daniels testified, their dispute is not about the work that was done. Their dispute is that my client didn't come to them beforehand and get preapproval to do it. So when we're talking about a classic fraud case where we're just lying about the loads, right, then what you're saying would hold true. But there was no dispute in the record that that's not this case. This case was not about misrepresenting the work. Connie Tech's witnesses acknowledged that. This was about you said that you had approval to do the work, that you came to us and you got preapproval to go for it when you didn't. That was the misrepresentation. So in order to cause harm, right, that's the element that we're appealing on, the link between the misrepresented approval to do the work and the payments that went out. In order to show that you were overpaid, you have to show that what would you have been paid? What would you have paid someone else for the services? And what the Connie Tech witnesses told the jury was, well, we would have used McLaughlin Freight Services and paid him this rate if no one else could do it. But doesn't your argument run into the Iowa Supreme Court's decision in Midwest Home? I'm sorry, Judge? The Iowa Supreme Court's decision in the Midwest Home case. Are you familiar with that? I'm not familiar with that. What was the? Well, I think it essentially says that, well, I can quote it, a defrauding defendant will not be heard to say that its intentional misrepresentations were not the cause of any damages to the plaintiff because the plaintiff was not out anything. Judge, there are other Iowa cases that just simply refute that. I don't know. We've cited the Ott case in our briefings. Causation is an element of any fraud claim. And I think the distinction of what you're looking at and the actual element itself is I would agree with you that if Midwest One stands for the sense that I can't attack the basis for the counterfactual, right, the basis for the causation in a fraud case is what would have happened in the absence of those statements. And so if there's some amount of speculation that has to go into creating that counterfactual, then that's what Midwest One stands for. I can't. Well, let me rephrase it then for you. As I understand Iowa law, and you can correct me if I am misunderstanding it, is that if there's no out-of-pocket losses in a fraud case, which I think is what you're arguing, then the courts are to look to benefit of the bargain. And here benefit of the bargain would suggest that without approval, which is the misrepresentation, we're not paying. Well, that's simply not what the evidence at trial supports, though, because the evidence at trial is they had 18 hours to move this rubber. They have to pay somebody. They can't wait. Well, I think what you want to do is completely take away the requirement of getting approval, and that wasn't their deal. What I'm trying to point out is that when by default if no one else, if you want to say that you're not going to approve it, fine. Who was going to haul it then? You could have paid somebody twice this rate to haul it if you weren't going to pay us. But Iowa law doesn't allow a fraudster to get away with fraud because there's no out-of-pocket damages. That's so correct. Tell me what case says I'm wrong. No, you're wrong on Iowa law. Iowa law requires the person who brings a fraud claim to prove the element of causation and link the misrepresentation to damages. Well, isn't the causation here, and I assume there was some testimony on these lines, that there was a purpose for having the approval process, and that your client by fraudulently stating he had approval went around that whole process? And that's the process we're talking about is, yes, there was the process. Present your one-way rates or your load availability. And if you don't have that, we want to pre-approve your authority to bill for a rounder. But if nobody else, if we can't get that rubber moved from Lincoln to Mount Pleasant with one-way rates, by default, we're going to authorize you to bill a rounder. Get us the trucks into Lincoln to move that because we don't want the plant to shut down. And so the problem for the plaintiff here is that the undisputed procedure, the undisputed fact is that if no one else, if we circumvent the approval process, we don't give them that opportunity. I'm not here to suggest that the facts wouldn't allow the jury to conclude that. But if that's the case, what you have to show is then that somebody else would have done it. Because if we would have honestly, right, in that sense said we're not going to do this for a one-way rate, then you have to say, well, what would have happened then? You have to go out and find somebody else. What would they have been paid? And if you don't do that, if you don't have evidence that we would have just accepted the one-way rate, which they don't, then what you're left with is the process that says, well, we need the rubber. It would have gone to you by default as a rounder and we would have paid it. And that's what happened. And so when we're talking about Iowa requiring the plaintiff to prove causation, what you're suggesting is that, well, as long as the liability elements are satisfied, we don't have to look at causation and damage. We wouldn't even need to instruct on it in that case. And that's the problem here, is when the district court is reviewing the record under the Reeves case, under the Supreme Court's Reeves case, which clarified its statements in Wilkerson about reviewing the record as a whole, you have to account for the undisputed facts. You have to take into consideration what the party opponent has admitted in the course of trial to doing and the impact of those admissions on their theory of the case. And here, because the procedure that they operated under ends up with the same payments and the same amount to the same person either way, and there's no evidence to the contrary, they haven't satisfied that causal bridge. They haven't connected those liability elements that you're talking about to damages. And without that connection, judgment as a matter of law is appropriate. Unjust enrichment fails for similar reasons. We've looked at that in our briefing. I don't want to spend too much time on that given the amount of time I've spent on fraud causation. But when you're looking at unjust enrichment, you're looking at restitution, right? It's not damage. How much is the party injured? How much has there been unjust gain? And I want to point out the three or four, 645 loads. Only three. So why isn't that argument moot in light of the fact that the district court remitted the unjust enrichment awards to zero? Well, I suppose it is, Judge. If the plaintiff's position is that the remitted unjust enrichment, you know, their remitted verdict on that is zero, then you're right. Then it's zero, and we're only here talking about fraud. As to the remitter of my client's judgment, that was done, as we've briefed, without jurisdiction to do so. The plaintiff, in this case, Connie Tech, a judgment was entered. They did not make any post-trial motion to remit that judgment. The 28-day jurisdictional deadline of Rule 59 passed without any action. And about 11 months later, the district court, sua sponte, without notice, which was required under Rule 59 before the court act, sua sponte, remitted my client's judgment. And so for jurisdictional reasons, we'd ask that the court restore that judgment in full. And unless there are further questions, I would like to reserve the balance of my time. Thank you. Thank you, Mr. Carles. Mr. D? May it please the Court, Chief Justice Smith, Judge Grunder, Judge Gross, let me start, with your permission, with where Mr. Carles started, which is this issue of fraud damages. McLaughlin, I want to point out one thing on the record. McLaughlin Freight relies on one series of questions that is at page 6 of their reply brief, which then, that of course, cites to the appendix. The question for the Connie Tech witness was what Connie Tech had done historically in the rare emergency situations where they couldn't get a driver during the week to make a delivery from Lincoln to Mount Pleasant. You know, and it said, when that happened, what did you do? And they say, well, we would use McLaughlin. Connie Tech, if you, McLaughlin has now, if you listen to counsel's argument and read their briefs, has extrapolated that question about what Connie Tech did historically into a, this is what Connie Tech would have done going forward had it known about all this. There is no question, there were no questions to Connie Tech whatsoever about what would you have done had you known that you were getting charged rounders for 645 deliveries, which is more than half of all the deliveries in the time period. And we don't know the answer to that. But Connie Tech never had reason to determine what they would do in the alternative because the fraudulent scheme worked so well for so long. We don't know if Connie Tech would have terminated McLaughlin, which it eventually did. Would it have gotten other carriers? Would it have renegotiated with McLaughlin? Would it have rescheduled the rubber manufacturing process in Mount Pleasant? But my point is this whole argument that McLaughlin makes, that Connie Tech admitted it would have used McLaughlin regardless of whether or not these were rounders, is no support in the record. The record indicates from Connie Tech that these rounders were typically on the weekends. We went through the whole, you know, we've got the layout of how these emails worked. But anyway, the success of McLaughlin's scheme prevented Connie Tech from determining what it would have done. Well, and then once they discovered it, they figured out what to do. They terminated McLaughlin and they went and got contracts with other truckers. And in addition, in addition, from a practical standpoint, the argument that McLaughlin makes that McLaughlin would have, that Connie Tech would have hired McLaughlin to do all these 645 rounders had it known completely contradicts the extreme efforts that Dan McLaughlin went through to falsify these emails to get approval for rounders and keep it hidden from Connie Tech. Is there anything in the record to indicate that these rounders actually were rounders? Yes, good question, Judge. Mr. McLaughlin testified in his, let's see if I can find my notes here, testified that all 645 deliveries were in fact rounders. That was his testimony. It was an all or nothing basis. That evidence was flatly contradicted. That testimony, Your Honor, was flatly contradicted by the evidence. For example, in the record, and these are all examples we cite in our brief, Mr. McLaughlin gave numerous different explanations for what constituted a rounder. Not just a round trip from Mount Pleasant to Lincoln with an empty truck and then bring back a full load from Lincoln, but they talked about bounces when you bring a truck in from somewhere else to Lincoln to pick up rubber and come in. Deadhead miles. For example, Mr. McLaughlin had a trucking expert witness who testified that if you bring a truck into Lincoln from more than 300 miles away, you should charge your owner for a round trip rate. Okay, fine, and Mr. McLaughlin adopted that in his testimony. We then went through the, well, we have the trucking records from all these 645 deliveries. We went through and started pulling out trucking records that indicated, that had instances where some of these bounces were from 30 and 50 miles away from Lincoln that Mr. McLaughlin was charging rounders. Let's say in, you know, North Platte and Ogallala, maybe even Omaha. So that testimony was out the window. Mr. McLaughlin testified about charging rounders for what he called deadhead miles. And the example he used in court was, he talked about a trucker who lives in Fairfield, Iowa, in Southeast Iowa. McLaughlin would have him start his day from his home in Fairfield, drive to Hannibal to pick up a load, drive from Hannibal over to Quincy, Illinois with a load, deliver a load from Quincy, Illinois to Lincoln, and then pick up the load that's in question in this case from Lincoln, deliver it to Mount Pleasant. He would charge Conitech, who was at the back end of that route, a rounder to cover the driver's time spent driving in the morning from Fairfield to Quincy. So not a round trip in that respect. Mr. McLaughlin admitted there was no rhyme or reason for how he billed rounders. And then he testified that the prior scheduler at Conitech, who was not the scheduler when all of this happened, had given him approval to do all of these rounders billed in this way. It was a guy named Scott Hausman. They called him to testify, and Mr. Hausman completely contradicted. He said, no, I never gave him permission for this. The bottom line with all this, Your Honor, is Mr. McLaughlin took this all or nothing approach to all 645 deliveries or round trips, and he, frankly, lost all of his credibility, in my opinion, with the jury. He got, through documentary evidence and through the testimony of other witnesses, the testimony he provided on this stuff was completely contradicted, and the jury had no problem disbelieving what was involved here with that. So let me talk a little bit then. We were talking about causation. Judge Grunder, you were asking questions about causation. It occurred to me in preparing for this argument and reviewing the briefs that what McLaughlin is really trying to argue with this causation argument, he's trying to back up the causation from the submission of the falsified e-mails to the initial decision that McLaughlin made to send the driver out in the first place. I think he's, the proper question is, actually, the submission, the proper causation, excuse me, is the submission of the false e-mails. You know, jury instruction 14 talks about, you know, standard fraud instruction misrepresentation, excuse me, misrepresentation is the cause of a party's damages, if, on and on and on. Jury instruction 19 is another stock instruction. The measure of damages for fraud is the amount of money that would place the injured party in the same position as if the false representations hadn't been made. There were no objections to these instructions. They're not subject to appeal. The false representations slash misrepresentations were the falsified e-mails. Think about it this way. The deliveries had already taken place. The practice that Mr. McLaughlin used was to submit these approval e-mails at the end of the week for the prior week. So by the time Mr. McLaughlin is going through the tedious process of falsifying these e-mails, the delivery has already taken place. He could just as easily at that point have submitted the documentation for payment for a one-way trip, for a one-way delivery. He had that choice. The delivery was done. Connie Tech has the rubber in the plant. Mr. McLaughlin is now submitting the documents to get paid, and at that point in time he decides, I'm going to falsify the e-mail, and I'm going to get double recovery. Without that falsified e-mail, he's paid a one-way rate and not a two-way rate. It is a very straightforward, straight-line causation issue legally and factually. And the district court agreed in its ruling on the post-trial motions. Judge Rose pointed out, among other things, primarily at page 9 of her order, Dan McLaughlin testified he changed approval e-mails for rounders. He printed fake approval e-mails and submitted them. The jury had an adequate basis to find McLaughlin's conduct was the factual and legal cause of injuries. The evidence supports a conclusion that Dan McLaughlin submitted falsified documents and received unearned payments, not that the causation was his decision whether or not to take the loads in the first place. And this was all argued to the jury through Mr. McLaughlin's testimony and other evidence and through argument afterwards. And the jury just rejected all of it. This was, as your honors can imagine, with the documentation to back up 645 separate incidents of fraud. This was the trial we were, I think we did it fairly efficiently. We did a Monday through Friday trial. But there's a lot of documents. The record is very robust. And the jury had a lot to consider. And the jury had every one of these arguments that McLaughlin is now making to this court was made to the jury and made to the district court. The district court rejected it all as a matter of law. The jury rejected it all as a matter of fact. Towards the end of counsel's argument here with the court, he made a brief reference to causation in the unjust enrichment damages. As a side note, if this court upholds Judge Rose's decision to eliminate the double recovery, it's a bit of an academic discussion about the damages and all that for unjust enrichment. But, you know, as the court knows, Mr. McLaughlin, McLaughlin Freight I should say, claims that the unjust enrichment damages should be reduced and measured against McLaughlin's actual expenses. Actually, his profits for the 645 loads. Instruction 21, which is, again, I think it's pretty much a stock instruction on unjust enrichment. The measure of damages is the fair and reasonable compensation for the benefits received. No objection to that instruction. That's not on appeal. The parties agreed what the fair and reasonable compensation is in the rate schedule that McLaughlin negotiated with DSB, Connie Tech's third party administrator. Connie Tech's benefit received, of course, was the rubber getting delivered. But the rubber getting delivered from point A to point B for what was supposed to have been a one-way rate. McLaughlin would have the court now dive into McLaughlin Freight's all its underlying costs and calculate its profit. You know, what did McLaughlin Freight pay its truckers? What were its overhead? What were its other expenses? But fair and reasonable compensation does not equal profits. We cited a case, a ruling from Judge Williams in the Northern District of Iowa that I would suggest is instructive to the court. The CRST versus Swift Transportation in which Judge Williams did an analysis on some cross motions for summary judgment and found that the issue of damages for unjust enrichment was a fact issue that needed to go to trial. But he did rule that the plaintiff's request for damages for unjust enrichment for the profits that the defendant received from the alleged unjust enrichment was improper and that was not going to be a proper measure of damages. Counsel, did you request pre-judgment interest under Rule 59e? We did not, Your Honor. We did not, Your Honor. And let me give you the once-over. Here's why. As the court may recall, the issue of double recovery was a major source of discussion among the parties and the court prior to instructing the jury. Both parties have, and certainly we do in our brief, all sorts of sites to the record during that conference. It went back and forth about what are we going to do about double recovery, what do we do to avoid double recovery, and then the offset of the verdicts. So we had an agreement, the parties and the court reached an agreement during the instruction conference that the court would deal with any issue of double recovery. The jury was instructed in, I think it was jury instruction, yeah, jury instruction 11. They were instructed to analyze each cause of action separately as if it was a stand-alone cause of action. I want to make one additional point that's not in our brief. My co-counsel and I recalled that the jury had a question during their deliberations, and the question was essentially, can we find, the question was about additional damages for Connie Tech's son, Justin Richman's claim, if they had already found for fraud, something like that. And counsel all agreed, and Judge Rose sent back an answer that said, I will deal with the issue if there's double recovery. You consider this on its own. That's at docket number 106. I'm afraid it's not in our appendix. Can I ask a question? We had that. Just one question on the fraud real quick. The fraud damages that were awarded, was it the total of the, was it 436 rounders, or was it that total less what would have been paid for one way? It was, it was the delta between the one-way rate that McLaughlin, that Connie Tech owed and would have paid, and the two-way rate for all 645. Got it. So the damage is taken into account that McLaughlin was properly paid for the one-way rate. So getting back to the question on the. So were you aware of both pre- and post-judgment? Yeah, the pre-judgment interest. Bottom line was then, when Judge Rose entered the judgment right after trial, at the end of the judgment she has a statement that says matters related, the court is going to enter a subsequent order related to matters of offset. And the offset has to deal with the recovery of double, has to deal with, you can't do the offset without dealing with this issue of double recovery. Based on all of this, Your Honor, and McLaughlin, and the agreement that we had with McLaughlin and the court during the instruction conference on double recovery, we were waiting for this further order from the district court that is mentioned in the verdict form. You all on that side of the table see a lot more judgments and a lot more verdicts than we do on this side. But I've been doing this for more than 30 years, and I've never seen a judgment entered where the court said, I'm going to enter a subsequent order to clarify this. So we were waiting on Judge Rose to deal with that further order. I would ask the court, we were surprised when Mr. McLaughlin and McLaughlin Freight filed their motion. Judge Rose then used that motion, the motions that McLaughlin filed, as the basis for entering that further order. But I would suggest to the court on this record and on this particular procedure, what happened with these things given the agreements on double recovery, given the line, the comment at the end of Judge Rose's judgment, that this is a bit of a procedural unicorn. I would ask the court at a minimum that the ambiguity, that there was ambiguity in whether or not we were waiting for the court to enter this further order, or whether we needed to proceed with the post-trial motions. I ask, I realize my time is up, I wanted to finish your answer. But I would ask the court that at a minimum, that given the specifics of this case and what happened, that any failure of us to file a Rule 59 motion for prejudgment interest within 28 days of that judgment is excusable. Thank you. Thank you, Mr. D. Mr. Collins, everybody. Regarding your question about the work, Judge Smith, page 13 of our reply brief block quotes, the work, this is Connie Tex, witnesses. Question, the dispute in this case is about the billing procedure for those loads. Answer, yes, sir. I believe you used the phrase, they were billed incorrectly. Is that fair? I think that's fair. Question, and the work to get those loads delivered is also not an issue here, correct? Answer, correct. The other Connie Tex employee who was involved in moving the freight, you're not claiming that Dan McLaughlin or McLaughlin Freight Services has lied about the actual work he performed here, correct? Answer, correct. This is a case about billing approval. Answer, yes, sir. This is not the stereotypical fraud case where you're lying about something that you did in order to get paid for it. You did the work. You just didn't get preapproval to do the work. Which was an agreement and a requirement. I don't understand why Mr. Deese, I think, simply explained, in the absence of the fraud, your client would have only been paid for a one-way trip. No, false. There's nothing in the record that he would have accepted a one-way rate when it costed him $1,167, more than twice that, to haul it. He's saying, no, I'm not hauling it. Then why did he engage in fraud? Because the answer is, he's working with these guys for 20 years. He's told by the prior guy that if he needs to run around her, he's going to run around her. The jury didn't buy that. You're asking why, though. I can't argue against what the jury's permitted to find. But what I can say is that, under the agreed procedure, even if you want to say that there's liability elements. No, no, no. The agreed procedure is, you have to get preapproval. That's the agreed procedure. And there was fraud in that. Correct. But that doesn't cause damage. That's the point of this appeal. Of course it does. He would have only paid for a one-way in the absence of the phony preapproval. There's nothing in the record, though, that says that he would have done the work for a one-way rate. That's the distinction you're missing. There's nothing that says he would have done it for a one-way. And if he turns it down, they've got to go find somebody else. And there's nothing in the record about what that somebody else would have accepted. And that's why their fraud causation piece falls apart. In my 15 seconds, I want to address, Judge Rose remitted my client's verdict in a divide-by-two fashion. But my client's counterclaims that the jury found in our favor against Connie Tech were not completely overlapping, as her divide-by-two math would suggest. In order to view those verdicts in a light, most favorable to the evidence, what did the evidence support? Minimally, we should have gotten full credit for the unjust enrichment verdict, $266,000. And the fraud verdict is supported by the evidence in the amount of $211,000. This is laid out. The evidentiary citations are on page 53 of our brief, opening brief, which results in a total judgment of about $492,000. Because the district court just divided by two and didn't take into account that the evidence supported those verdicts differently, it was error to remit, as she did. And unless there are further questions, thank you for this morning, judges. Thank you, Mr. Carls. Thank you also, Mr. Dee. I quite appreciate both counsel's participation and argument before the court this morning. It's been helpful. We'll continue to study your briefing and render decision in due course. Thank you. Thank you.